# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JAMES FRIERSON**, Individually and as administrator of the ESTATE OF JIM ROGERS, Decedent, and on behalf of the Estate's Sole Beneficiary, Lanesha Kennedy<br><br>Plaintiff,<br><br>v.<br><br>**CITY OF PITTSBURGH**, A Municipal Corporation, **OFFICERS KEITH EDMONDS**, individually and in his official capacity, **LIEUTENANT MATT GAUNTNER**, individually and in his official capacity , **ROBERT PEDLEY**, individually and in his official capacity, **PAT DESARO**, individually and in his official capacity, **GREG BOSS**, individually and in his official capacity, **JEFF DEAN**, individually and in his official capacity, **PAUL FROEHLICH**, individually and in his official capacity, **NEYIB VELAZQUEZ**, individually and in his official capacity, **LEROY SCHROCK**, individually and in his official capacity, **SARGEANT COLBY NEIDIG**, individually and in his official capacity and **SARGEANT CAROL EHLINGER**, individually and in her official capacity **JOSHUA PARKINSON**, individually and in his official capacity and **ROMI CHAOUK**, individually and in his official capacity.<br><br>Defendants. | **Civil Action**<br><br>**No.: 2:22-cv-00523 CRE**<br><br>**THIRD AMENDED COMPLAINT IN CIVIL ACTION**<br><br><br>**JURY TRIAL DEMANDED** |

## **THIRD AMENDED COMPLAINT IN CIVIL ACTION**

AND NOW comes the Plaintiff, James Frierson, individually and as Administrator of the Estate of Jim Rogers, Decedent, on behalf of the Estate's sole beneficiary, Lanesha Kennedy, by and through his undersigned counsel, Todd J. Hollis, Esquire, of Todd J. Hollis Law, who files the following THIRD AMENDED COMPLAINT IN CIVIL ACTION, to recover damages for injuries and death sustained as a result of excessive, unreasonable and unnecessary force used by the named Defendants during their arrest of Decedent on October 13, 2021 in violation of his rights under the United States Constitution and their failure to provide him with necessary medical care, stating in support thereof as follows:

## **INTRODUCTION**

This action arises from the wrongful death of Mr. Jim Rogers caused by the City of Pittsburgh, its police officers, and its Emergency Medical Service, (hereinafter "EMS") technicians.

1. On the morning of October 13, 2021, Jim Rogers (hereinafter, "Mr. Rogers"), an unarmed 54-year-old man, died in a Pittsburgh residential neighborhood after a City of Pittsburgh police officer tasered him more than six (6) times, following which a number of other officers and "EMS" technicians -- pursuant to, *inter alia,* the custom of the City of Pittsburgh to transport suspects to UPMC Mercy Hospital because of its proximity to the Allegheny County Jail -- failed to provide needed medical care to him and failed to assess his physical condition.

### **The 911 Call**

2. These tragic events began when Mrs. Lauren Crossett, a citizen at 5110 Harriet Street, Pittsburgh, Pennsylvania called the Department of Emergency Services via a 911 call, claiming that she observed Mr. Rogers taking a bicycle from a neighbor's porch.

### **The Illegal Search**

3. Officer Keith Edmonds, (hereinafter, "Officer Edmonds"), was dispatched to the scene; he located Mr. Rogers, who fit the description of the alleged thief and, after using Code 4 to call off his backup as is customary, illegally searched him.

**The Use of Excessive Force**

4. Although Officer Edmonds ascertained that Mr. Rogers was not armed and presented no physical threat to him or any third party, he tased Mr. Rogers more than six (6) times, giving rise to the defendants' duty to provide him with medical treatment.

**Failure To Provide Medical Care**

5. After Officer Edmonds called for backup due to his fear of and inability to place Mr. Rogers into handcuffs, the other defendants were summoned to the scene. Within nineteen (19) seconds of the arrival of backup, Mr. Rogers was handcuffed without the use of any additional tasering.

6. Following the handcuffing of Mr. Rogers, no defendant performed any medical assessment of Mr. Rogers, and instead placed him, handcuffed and restrained by a seatbelt, in the back of a police cruiser. For the next several minutes, Mr. Rogers made numerous loud requests for medical treatment, and at least once, warned that he was having a stroke. Upon information and belief, including but not exclusively limited to the fact that Mr. Rogers was screaming with the window open, and the close proximity of the defendants to said screaming, each defendant believed that Mr. Rogers was in need of medical treatment, but none of them took any steps to assess Mr. Rogers' condition or otherwise cause said assessment to occur.

7. Additionally, one or more officer defendants instructed the medical defendants to respond to the scene in order to "de-contaminate" Mr. Rogers' blood from the officers' bodies. When the medical defendants arrived, one (1) or more officer defendants directed the medical defendants to the officers with Mr. Rogers' blood on them and did not ensure that the medical defendants evaluated Mr. Rogers, who was in the custody of the officer defendants. After all the officers were "de-contaminated," the medical defendants were told by the officer defendants that there was no further need for the medical defendants on scene. However, upon information and belief, including but not exclusively limited to the fact that Mr. Rogers was screaming with the window open, and the close proximity of the medical defendants to said screaming, both medical defendants believed that Mr. Rogers was in need of medical treatment, but neither of them took any steps to assess Mr. Rogers' condition or otherwise cause said assessment to occur.

**The Transport**

8. Officers Pat Desaro (hereinafter, "Officer Desaro") and Greg Boss (hereinafter, "Officer Boss") were tasked by Lieutenant Matt Gauntner (hereinafter "Lieutenant Gauntner")

with the responsibility of transporting Mr. Rogers to UPMC Mercy Hospital in their patrol car.

9. Pittsburgh's official policy is to transport arrestees to the closest hospital with an emergency room. However, instead of driving Mr. Rogers to the closest hospital with an emergency room, Officers Desaro and Boss, pursuant to Lieutenant Gauntner's direction which was itself, made in accordance with a City of Pittsburgh custom to transport arrestees to UMPC Mercy Hospital even though there are closer hospitals with emergency rooms, which in direct contravention to the policy, bypassed West Penn and UPMC Shadyside Hospitals, both of which were just a few blocks away and both of which had Emergency Departments, and instead headed for Mercy Hospital, a farther distance away by both distance and time.

10. As the officers proceeded to Mercy Hospital, Mr. Rogers was continuing to rapidly deteriorate and becoming more and more unresponsive. During the ride before he lost consciousness and went into cardiac arrest, Mr. Rogers continued to beg Officers Desaro and Boss for medical treatment. These defendants observed and could hear Mr. Rogers' condition, yet, they failed to:

    a. activate their emergency lights and/or sirens;
    b. radio dispatch that Mr. Rogers was experiencing medical distress;
    c. not make unnecessary stops during the transport;
    d. treat the matter as an emergency; and/or;
    e. divert from the City of Pittsburgh custom to take arrestees to UPMC Mercy [based on is proximity to the Allegheny County Jail] against the policy of taking arrestees to the closest hospital with an emergency room;
    f. follow the policy and take Mr. Rogers to West Penn Hospital or Shadyside Hospital, both of which were approximately one (1) to two (2) minutes away from the scene of the arrest and available to provide medical treatment to Mr. Rogers.

11. Approximately eight (8) minutes before arriving at UPMC Mercy, after having passed UPMC Shadyside Hospital and driving away from West Penn Hospital, Mr. Rogers went into cardiac arrest and stopped moving and breathing.

12. Officer Edmonds who followed Officers Desaro and Boss to UMPC Mercy from his own vehicle, began administering cardiopulmonary resuscitation (CPR) to Mr. Rogers. UPMC Mercy Hospital staff took over treatment and were able to bring Mr. Rogers back from the dead, until the next day when he died again.

13. This is a civil rights action seeking damages collectively against the above-captioned defendants for violations of Mr. Rogers' rights, privileges, and immunities guaranteed under the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. §1983, and Pennsylvania common law.

## JURISDICTION AND VENUE

14. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

15. This Honorable Court has jurisdiction of the within matters pursuant to 28 U.S.C. §§1331 and §§1343 such that the causes of action enumerated herein arise under the Constitution, treaties or laws of the United States.

16. In particular, the causes of action enumerated herein arise under the Civil Rights Act of 1871, as amended, 42 U.S.C. §1983, and the Fourth and Fourteenth Amendments of the United States Constitution. Further, this Honorable Court has supplemental jurisdiction of state law claims pursuant to 28 U.S.C. §1367(a).

17. Venue is properly laid in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because: (a) Defendants reside in and/or conduct business in this judicial district; and/or (b) because the acts and omissions giving rise to the claims set forth herein (including specifically Mr. Rogers' arrest by Defendant officers and the injuries and death resulting therefrom) occurred exclusively in this judicial district.

## PARTIES

18. Mr. Rogers was, at the time of his death, a 54-year-old man who resided in Pittsburgh, Pennsylvania.

19. Plaintiff is James Frierson, Administrator of the Estate of Jim Rogers. Mr. Frierson is a resident of Allegheny County. As administrator of the Estate to which Lanesha Kennedy is the sole beneficiary, Mr. Frierson's actions on behalf of the Estate are for the benefit of Lanesha Kennedy.

20. Defendant, City of Pittsburgh, is a municipality in the Commonwealth of Pennsylvania, which, at all relevant times, employed the City of Pittsburgh police officers who were at the scene of the Decedent's arrest and transport and who committed and/or participated in the wrongful acts alleged herein and/or did nothing to prevent Defendant officers' illegal acts.

21. Defendant Officer Keith Edmonds is/was a City of Pittsburgh police officer who, at all relevant times, was employed by Defendant City of Pittsburgh. At all times relevant

hereto, Defendant Edmonds was acting within the scope of his employment as such. He is being sued both in his individual and official capacity.

22. Lieutenant Matt Gauntner is/was a City of Pittsburgh police officer who, at all relevant times, was employed by the Defendant City of Pittsburgh. At all times relevant hereto, Defendant Gauntner was acting within the scope of his employment as such. He is being sued both in his individual and official capacity.

23. Defendant Officer Pat Desaro is/was a City of Pittsburgh police officer who, at all relevant times, was employed by the Defendant City of Pittsburgh. At all times relevant hereto, Defendant Desaro was acting within the scope of his employment as such. He is being sued both in his individual and official capacity.

24. Defendant Gregory Boss is/was a City of Pittsburgh police officer who, at all relevant times, was employed by the Defendant City of Pittsburgh. At all times relevant hereto, Defendant Boss was acting within the scope of his employment as such. He is being sued both in his individual and official capacity.

25. Defendant Jeffrey Dean is/was a City of Pittsburgh police officer who, at all relevant times, was employed by the Defendant City of Pittsburgh. At all times relevant hereto, Defendant Dean was acting within the scope of his employment as such. He is being sued both in his individual and official capacity.

26. Defendant Paul Froehlich is/was a City of Pittsburgh police officer who, at all relevant times, was employed by the Defendant City of Pittsburgh. At all times relevant hereto, Defendant Froehlich was acting within the scope of his employment as such. He is being sued both in his individual and official capacity.

27. Defendant Neyib Velazquez is/was a City of Pittsburgh police officer who, at all relevant times, was employed by the Defendant City of Pittsburgh. At all times relevant hereto, Defendant Velazquez was acting within the scope of his employment as such. He is being sued both in his individual and official capacity.

28. Defendant Colby Neidig is/was a City of Pittsburgh police officer who, at all relevant times, was employed by the Defendant City of Pittsburgh. At all times relevant hereto, Defendant Neidig was acting within the scope of his employment as such. He is being sued both in his individual and official capacity.

29. Defendant Carol Ehlinger is/was a City of Pittsburgh police officer who, at all relevant times, was employed by the Defendant City of Pittsburgh. At all times relevant hereto,

Defendant Ehlinger was acting within the scope of her employment as such. She is being sued both in her individual and official capacity.

30. Defendant Leroy Schrock is/was a City of Pittsburgh police officer who, at all relevant times, was employed by the Defendant City of Pittsburgh. At all times relevant hereto, Defendant Schrock was acting within the scope of his employment as such. He is being sued both in his individual and official capacity.

31. Defendant Officer Robert Pedley is/was a City of Pittsburgh police officer who, at all relevant times, was employed by the Defendant City of Pittsburgh. At all times relevant hereto, Defendant Pedley was acting within the scope of his employment as such. He is being sued both in his individual and official capacity.

32. Defendants Joshua Parkinson and Romi Chaouk are Emergency Medical Technicians (EMTs) and/or paramedics employed by the Defendant City of Pittsburgh. They are being sued both in their individual and official capacities.

## JURY DEMAND

33. Plaintiff demands trial by jury in this action.

## FACTUAL ALLEGATIONS

34. On October 13, 2021, Mr. Rogers, an unarmed 54-year-old man, was walking in the Friendship neighborhood of Pittsburgh, Pennsylvania.

35. At approximately 10:20 a.m., Mrs. Lauren Crossett contacted the City of Pittsburgh police stating that a man was stealing a bicycle from her neighbor's porch.

36. At approximately 10:29 a.m., Officer Edmonds arrived at the general location and located Mr. Rogers on Harriet Street. Officer Edmonds radioed "Code 4," which upon information and belief, is used by the police to inform their station that they do not need backup.

37. At no time did Officer Edmonds see Mr. Rogers with or near a bicycle. Nonetheless, while leaving a marked police car, armed, and in uniform, Officer Edmonds, upon information and belief including but not exclusively limited to the fact that Mr. Rogers stopped walking and put up his hands, that Officer Edmonds ordered Mr. Rogers to stop, and Mr. Rogers complied with Officer Edmonds' command.

38. Officer Edmonds began to question Mr. Rogers but did not listen to Mr. Rogers' responses. Officer Edmonds then escalated the encounter by raising his voice and by telling Mr. Rogers to shut up when Mr. Rogers was attempting to respond to Officer Edmonds' questions. Then, Officer Edmonds instructed Mr. Rogers to put up his hands and Mr. Rogers complied. Then, without any facts to indicate that Mr. Rogers was armed and/or dangerous, Officer Edmonds frisked Mr. Rogers.

39. After the frisk, and without any facts to reasonably suggest that Mr. Rogers had committed a crime for which evidence could reasonably be found in his pocket, Officer Edmonds reached his hand into Mr. Rogers' pocket to attempt to pull out Mr. Rogers' wallet. Mr. Rogers held on to his wallet as Mr. Edmonds attempted to illegally take it.

40. Officer Edmonds then threw Mr. Rogers to the ground. A video of the interaction shows that Officer Edmonds unreasonably escalated the matter by yelling at Mr. Rogers, gave him conflicting orders, and then employed his taser and electrocuted Mr. Rogers more than six (6) times without providing Mr. Rogers a reasonable opportunity to comply with his commands.

41. Upon information and belief, the electric current administered to Mr. Rogers caused him extreme pain, suffering and mental anguish.

42. During the course of these actions, Officer Edmonds radioed that he did in fact need backup, due to his fear of and inability to place Mr. Rogers into handcuffs. Once backup arrived, Mr. Rogers was handcuffed in about nineteen (19) seconds without any further tasering. Eventually, all of the individual officer defendants arrived at the scene.

43. Mr. Rogers was handcuffed and restrained in the back of a police cruiser for approximately eighteen (18) minutes. Upon information and belief, including but not exclusively limited to the fact that the police cruiser's window was open while Mr. Rogers was screaming for help, that Mr. Rogers' was tased then forcibly handcuffed, and that Mr. Rogers was bleeding, had difficulty breathing and was sweating, each officer defendant believed that Mr. Rogers needed medical treatment.

44. At 10:40 a.m., police requested that an ambulance be dispatched to the scene. However, this request was not made to provide Mr. Rogers with the medical treatment they knew he needed, rather, this request was because one or more of the officers had Mr. Rogers' blood on them, and they needed paramedics to wash the officers' hands.

45. When the medical defendants arrived, the officer defendants directed the medical defendants to those officers who needed their hands washed. After the officers' hands were washed, they told the medical defendants that there was no further need for the

medical defendants to be on scene. The medical defendants were told this, despite the officer defendants' belief that Mr. Rogers needed medical attention. In response, the medical defendants left the scene without ever assessing Mr. Rogers or otherwise providing him with medical treatment, despite that they too, could hear Mr. Rogers' pleas for medical care, and knew he was subjected to officer force, and that he was the source of the blood they were called to the scene to clean.

46. The officer defendants knew that the medical defendants did not assess or otherwise provide Mr. Rogers with medical treatment, yet the officer defendants allowed the medical defendants to leave the scene anyway.

47. Despite a City of Pittsburgh policy which requires that officers take arrestees in need of medical attention to the closest hospital with an emergency room, Lieutenant Gauntner instructed Officers Pat Desaro and Greg Boss to transport Mr. Rogers to UPMC Mercy Hospital. Upon information and belief, including but not exclusively limited to the fact that since 2016, out of the 144 times that officers from Zone 5 took an arrestee to a hospital, that policy was violated each of the 99 times the arrestee was taken to UPMC Mercy Hospital instead of West Penn Hospital and/or UPMC Shadyside Hospital, both of which have emergency rooms.

48. While in route to the hospital, Mr. Rogers made additional requests for medical treatment as he deteriorated. Approximately ten (10) minutes into the ride to the hospital, Mr. Rogers stopped breathing, went into cardiac arrest, and lost consciousness. This occurred approximately nine (9) and a half (1/2) minutes after the officers would have arrived at West Penn Hospital, and approximately eight (8) and a half (1/2) minutes after the officers would have arrived at UPMC Shadyside Hospital. Mr. Rogers did not get to UPMC Mercy for another approximately eight (8) minutes. During this time, after which Mr. Rogers had already died, the live video feed from the backseat to the front seat showed that Mr. Rogers stopped moving and collapsed over onto himself, and Officers Desaro and Boss were also aware that his speech progressed from slurred to silent. Despite these observations, these defendants did not do anything to ensure that Mr. Rogers was not in medical distress or to quickly get Mr. Rogers to the hospital.

49. Upon arrival at UPMC Mercy Hospital, it was determined that Mr. Rogers no longer had a pulse or was breathing. Officer Edmonds, who was following Officers Desaro and Boss in his police vehicle started CPR. Soon thereafter, UPMC Mercy Hospital staff came outside and took over Mr. Rogers' care. Unfortunately, by this point, while the UPMC Mercy staff were able to re-start Mr. Rogers' heart and breathing, it was too late, and Mr. Rogers died again the next morning.

50. As a consequence of his death, Mr. Rogers was deprived of the pleasures and enjoyment of life, liberty, and the pursuit of happiness.

51. The City of Pittsburgh previously failed to discipline Mr. Edmonds and, as such, tacitly approved Mr. Edmonds' actions.

## COUNT ONE

**42 U.S.C § 1985: CONSPIRACY TO VIOLATE RIGHTS SECURED UNDER THE FOURTH AND FOURTEENTH AMENDMENTS AGAINST OFFICERS KEITH EDMONDS** individually and in his official capacity**, LIEUTENANT MATT GAUNTNER** individually and in his official capacity**, ROBERT PEDLEY** individually and in his official capacity**, PAT DESARO** individually and in his official capacity**, GREG BOSS** individually and in his official capacity**, JEFF DEAN** individually and in his official capacity**, PAUL FROEHLICH** individually and in his official capacity**, NEYIB VELAZQUEZ** individually and in his official capacity**, LEROY SCHROCK** individually and in his official capacity**, SGT. COLBY NEIDIG** individually and in his official capacity **AND SGT. CAROL EHLINGER** individually and in her official capacity.

52. Plaintiff incorporates the allegations contained in the previous paragraphs of this Third Amended Complaint as if fully set forth herein.

53. The Defendant officers conspired to deny Mr. Roger' rights under the First and Fourteenth Amendment, pursuant to 42 U.S.C. § 1985.

54. Said conspiracy included, but is not limited to, the filing of false or misleading reports regarding the circumstances of Mr. Rogers' death and the issuance of inaccurate statements by the city or its employees regarding the circumstances of Mr. Rogers' seizure and search by the Defendants and the use of excessive force and the improper use of a Taser.

55. Said conspiracy is further evidenced by one or more Defendant officers, at the scene:

    a. Attempting to position their bodies so that bystanders could not see or videotape Mr. Rogers or officers' interactions with him; and
    b. Failing to obtain testimony from witness bystanders who desired to provide information that Officer Edmonds use of force against Mr. Roger's was excessive.

56. Said conspiracy was designed to prevent the family and the public from learning the true circumstances regarding Mr. Rogers' death and constituted a cover-up for the purpose of denying Mr. Rogers' access to the courts.

57. As a direct and proximate result of said violation, Mr. Rogers' family had to take additional steps including but not limited to the initiation of litigation to learn the truth of Mr. Rogers' demise.

## COUNT TWO

### 42 U.S.C. §1983: ILLEGAL SEARCH AND SEIZURE AND USE OF EXCESSIVE FORCE IN VIOLATION OF MR. ROGERS' RIGHTS UNDER THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AGAINST OFFICER KEITH EDMONDS individually and in his official capacity

58. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

59. Officer Edmonds unreasonably seized Mr. Rogers without reasonable suspicion or probable cause when Officer Edmonds instructed Mr. Rogers to raise his hands and stop walking, to which Mr. Rogers complied.

60. Officer Edmonds unreasonably frisked Mr. Rogers without any information that would allow Officer Edmonds to believe that Mr. Rogers was armed and/or dangerous.

61. Officer Edmonds unreasonably searched Mr. Rogers without a warrant and also without reasonable suspicion or probable cause no evidence of the crime of stealing a bicycle could reasonably be found in the location of the search, Mr. Rogers' pants pocket.

62. Officer Edmonds used unreasonable force against Mr. Rogers each time that Officer Edmonds intentionally caused electricity to enter Mr. Rogers' body. Upon information and belief, this occurred more than six (6) times.

63. Each time Officer Edmonds caused electricity to enter into Mr. Rogers' body Officer Edmonds was already aware that Mr. Rogers was not suspected of a serious and/or violent crime (based on the dispatch for a stolen bicycle) and also (based on his illegal frisk and illegal search) that Mr. Rogers was unarmed. Additionally, no one, including and especially Officer Edmonds was in any danger from Mr. Rogers, Mr. Rogers was not actively resisting arrest or otherwise attempting to harm Officer Edmonds or anyone else, nor was Mr. Rogers otherwise an immediate threat to anyone or fleeing from a serious crime.

64. Upon information and belief, Officer Edmonds used his taser for the purpose of causing Mr. Rogers enough pain to force Mr. Rogers to submit to an illegal search and seizure. However, Officer Edmonds knew or should have known that such use of his taser was in violation of the City of Pittsburgh Police Department's Taser Policy, Order # 12-13, effective date of 5/1/2012, which states at Paragraph 1.2 that the Taser is approved to control actively resisting subjects, aggressive non-compliant subjects, and violent or potentially violent subjects.

65. Said acts by Officer Edmonds described in this count were all taken under the color of state law and in his individual and official capacities and/or within the scope of his employment with the Pittsburgh Police Department and contrary to the policies in control of the use of his police powers, and thus, deprived Mr. Rogers of his rights secured by the Fourth and Fourteenth Amendments to the United States Constitution.

66. As a direct and proximate result of said violation, Mr. Rogers suffered the injuries, damages and death described above in an amount to be determined at trial.

## COUNT THREE

**42 U.S.C. §1983: DELIBERATE INDIFFERENCE TO MEDICAL NEEDS AGAINST OFFICERS KEITH EDMONDS** individually and in his official capacity, **LIEUTENANT MATT GAUNTNER** individually and in his official capacity, **ROBERT PEDLEY** individually and in his official capacity, **PAT DESARO** individually and in his official capacity, **GREG BOSS** individually and in his official capacity, **JEFF DEAN** individually and in his official capacity, **PAUL FROEHLICH** individually and in his official capacity, **NEYIB VELAZQUEZ** individually and in his official capacity, **LEROY SCHROCK** individually and in his official capacity, **SGT. COLBY NEIDIG** individually and in his officials capacity **AND SGT. CAROL EHLINGER** individually and in her official capacity

67. Plaintiff realleges each allegation contained in the preceding paragraphs as if set forth separately herein.

68. Upon information and belief, including but not exclusively limited to the fact that the police cruiser's window was open while Mr. Rogers was screaming for help, that Mr. Rogers' was tased multiple times, that the officers knew or should have known that Mr. Rogers was tased multiple times, that Mr. Rogers was then forcibly handcuffed, that Mr. Rogers was bleeding, and that he had difficulty breathing and was sweating, each of these defendants believed that Mr. Rogers was in need of medical treatment.

69. Defendant officers, acting under color of state law, deprived Mr. Rogers of his rights under the Fourth and Fourteenth Amendments to the United States Constitution, by

preventing and denying him critical medical attention. These defendants believed that Mr. Rogers needed medical treatment, yet they:

a. Did not assess Mr. Rogers' condition, despite him being tased multiple times, and then forcibly handcuffed as well as bleeding, difficulty breathing, sweating, and otherwise showing clear signs of medical distress;
b. Did not call paramedics to assess Mr. Rogers' condition, despite him being tased multiple times, and then forcibly handcuffed as well as bleeding, difficulty breathing, sweating, and otherwise showing clear signs of medical distress;
c. Directed the paramedics who arrived to clean Mr. Rogers' blood from the officers' hands without directing them to also assess Mr. Rogers;
d. Informed the paramedics that after they finished washing the officers' hands, that they were no longer needed at the scene;
e. Failing to give the paramedics a true history of their knowledge of Mr. Rogers' condition, e.g., failing to inform the paramedics of how many times Mr. Rogers was tased;
f. Leaving Mr. Rogers in the back of a police cruiser for almost twenty (20) minutes, while listening to Mr. Rogers scream for medical help as his condition deteriorated;
g. Not taking Mr. Rogers to West Penn Hospital, which was located four (4) minutes away by foot; and;
h. Not taking Mr. Rogers to UPMC Shadyside Hospital, which was located three (3) minutes away by vehicle.

70. As a direct and proximate result of the above actions, these defendants prevented Mr. Rogers from obtaining timely medical care, prolonged his pain and suffering, and caused his injuries to worsen and to lead to death.

71. These defendants' actions and/or inactions also violated policy, in that any use of a taser whether by drive stun or probes, wherein the arrestee shows any signs indicating a need for medical treatment which Mr. Rogers did and these defendants recognized the same, requires officers summon EMS immediately to assess and treat the arrestee.

72. These defendants' actions and/or inactions also violated policy, in that any use of a taser whether by drive stun or probes, requires the arrestee to be medically assessed and released by the closest hospital with an emergency room as soon as possible.

73. Upon information and belief, the delay in assessing Mr. Rogers' condition and providing medical treatment materially reduced Mr. Rogers' chances of survival and proximately caused his injuries, pain, suffering, and death, for which defendants must pay damages.

## COUNT FOUR

**42 U.S.C. § 1983: DELIBERATE INDIFFERENCE TO MEDICAL NEEDS AGAINST JOSHUA PARKINSON** individually and in his official capacity *and* **ROMI CHAOUK** individually and in his official capacity**, EMPLOYEES OF THE CITY OF PITTSBURGH EMERGENCY MEDICAL SERVICES**

74. Plaintiff realleges each allegation contained in the preceding paragraphs as if set forth separately herein.

75. Defendants Parkinson and Chaouk were dispatched, pursuant to the officer defendants' request, to the scene of Mr. Rogers' arrest.

76. While these defendants were not initially informed that Mr. Rogers was on scene, they discovered same upon their arrival.

77. Upon information and belief, including but not exclusively limited to the fact that the police cruiser's window was open while Mr. Rogers was screaming for help, that Mr. Rogers' was tased multiple times, then forcibly handcuffed, and that Mr. Rogers was bleeding, had difficulty breathing and was sweating, each of these defendants believed that Mr. Rogers was in need of medical treatment.

78. These defendants, acting under color of state law, deprived Mr. Rogers of his rights under the Fourth and Fourteenth Amendments to the United States Constitution, by preventing and denying him critical medical attention. These defendants believed that Mr. Rogers needed medical treatment, yet they never:

    a. Questioned him,
    b. Took his pulse,
    c. Checked his respiration,
    d. Took his blood pressure,
    e. Checked for head trauma,
    f. Looked over his body,
    g. Talked to him,
    h. Assessed his taser prong wounds,
    i. Attempted to determine how many times he was tasered,
    j. Removed taser hooks,
    k. Ensured that his airway was unimpeded despite being on notice of potential injuries and a duty to provide care to him; Provided any other reasonable medical care; or,
    l. Obtained his signature indicating that he was refusing medical care.

79. As a direct and proximate result of the above actions, these defendants prevented Mr. Rogers from obtaining timely medical care, prolonged his pain and suffering, and caused his injuries to worsen and to lead to death.

80. Upon information and belief, the delay in assessing Mr. Rogers' condition and providing medical treatment materially reduced Mr. Rogers' chances of survival and proximately caused his injuries, pain, suffering, and death, for which defendants must pay damages.

## COUNT FIVE

### 42 U.S.C. § 1983: MONELL LIABILITY CLAIMS AGAINST CITY OF PITTSBURGH

81. Plaintiff repeats, reiterates and realleges each and every allegation contained herein above with the same force and effect as if hereinafter set forth at length.

82. This defendant knowingly permits a custom of deliberate indifference by its police department in the screening of officers. As a direct and proximate result of this custom, and as is highly likely, incompetent individuals including but not limited to Officer Edmonds (who upon information and belief, originally failed out of the police academy because he could not read) become police officers for the City of Pittsburgh; and due to said incompetence, substantially increases the risk that said incompetent officers would violate the civil rights of, *inter alia*, Mr. Rogers who was injured and died as a direct and proximate result of this custom. Plaintiff expects that discovery will reveal myriad additional examples of this custom.

83. This defendant knowingly permits a custom of officers using "Code 4" when approaching a suspect, despite that this custom is in contravention to policy and training. As a direct and proximate result of this custom, and as is highly likely, officers including but not limited to Officer Edmonds, put themselves at a tactical disadvantage; and due to said disadvantage, substantially increases the risk that officers would violate the civil rights of, *inter alia*, Mr. Rogers who was injured and died as a direct and proximate result of this custom. Plaintiff expects that discovery will reveal myriad additional examples of this custom.

84. This defendant knowingly permits a custom of deliberate indifference by its police department to unreasonable searches and seizures. As a direct and proximate result of this custom, and as is highly likely, officers including but not limited to Officer Edmonds (who could not recognize that his act of reaching into Mr. Rogers' pocket was a "search" long after the events of October 13, 2021) are emboldened by or unable to

recognize when a search and or seizure is legal or not. This substantially increases the risk that said incompetent officers would violate the civil rights of, *inter alia*, Mr. Rogers who was injured and died as a direct and proximate result of this custom. Plaintiff expects that discovery will reveal myriad additional examples of this custom.

85. This defendant knowingly permits a custom of deliberate indifference by its police department to excessive force. As a direct and proximate result of this custom, and as is highly likely, officers including but not limited to Officer Edmonds are emboldened by this defendant's ratification of excessive force (which happened when Officer Edmonds was personally involved in a similar incident of tasing an unarmed man fleeing from a minor property crime yet, his actions were deemed by this defendant to be reasonable, despite that in that instance, Officer Edmonds violated policy). This "rubber stamp" ratification substantially increases the risk that officers would violate the civil rights of, *inter alia*, Mr. Rogers who was injured and died as a direct and proximate result of this custom. Plaintiff expects that discovery will reveal myriad additional examples of this custom.

86. This defendant lacks a policy, despite the extremely high likelihood that in the course and scope of a police officer's duties, that they would physically confront suspects or otherwise gain custody of a person in need of medical care, requiring the arresting officer, officer in charge, or any other officer on scene to medically assess the arrestee and/or otherwise ensure that paramedics do so. As a direct and proximate result of the absence of this policy, and as is highly likely, medical assessment and/or treatment is delayed for arrestees. This substantially increases the risk that officers would violate the civil rights of, *inter alia*, Mr. Rogers, who was injured and died as a direct and proximate result of the absence of this policy.

87. This defendant lacks a policy, despite the extremely high likelihood that in the course and scope of a paramedic's duties, that they would be called to the scene of an arrest to provide medical assessment or treatment, that requires its paramedics to medically assess the arrestee and not just the police officers even if the police officers say that the arrestee does not need the paramedics. As a direct and proximate result of the absence of this policy, and as is highly likely, medical assessment and/or treatment is delayed for arrestees. This substantially increases the risk that paramedics would violate the civil rights of, *inter alia*, Mr. Rogers, who was injured and died as a direct and proximate result of the absence of this policy.

88. This defendant knowingly permits a custom of officers taking arrestees to UPMC Mercy hospital, despite that this custom is in contravention to policy. As a direct and proximate result of this custom, and as is highly likely, medical assessment and/or treatment is delayed for arrestees. This substantially increases the risk that officers would violate the

civil rights of, *inter alia*, Mr. Rogers, who was injured and died as a direct and proximate result of the absence of this policy. Plaintiff expects that discovery will reveal myriad additional examples of this custom.

89. This defendant knowingly permits a custom of deliberate indifference in the training, supervision, and discipline of its police officers. Particularly, the training, supervision, and discipline offered to its officers did not sufficiently teach, *inter alia*, Officer Edmonds, the proper procedures for use of backup, the way to legally stop, frisk, search, and/or arrest a suspect, the proper use of force including tasers, and the proper administration of medical assessment and/or treatment to arrestees. Such failures would obviously lead to constitutional violations, yet, this defendant allows officers, including but not limited to Officer Edmonds, to remain on the force. This substantially increases the risk that officers would violate the civil rights of, *inter alia*, Mr. Rogers, who was injured and died as a direct and proximate result of this custom. Plaintiff expects that discovery will reveal myriad additional examples of this custom.

90. As a direct and proximate result of the above referenced customs and/or lack of policies, Mr. Rogers suffered the injuries, damages and death described above in an amount to be determined at trial.

## COUNT SIX

**42 Pa.C.S. § 8301-8302- WRONGFUL DEATH and SURVIVAL AGAINST CITY OF PITTSBURGH AND OFFICERS KEITH EDMONDS** individually and in his official capacity**, LIEUTENANT MATT GAUNTNER** individually and in his official capacity**, ROBERT PEDLEY** individually and in his official capacity**, PAT DESARO** individually and in his official capacity**, GREG BOSS,** individually and in his official capacity **JEFF DEAN** individually and in his official capacity**, PAUL FROEHLICH** individually and in his official capacity**, NEYIB VELAZQUEZ** individually and in his official capacity**, LEROY SCHROCK** individually and in his official capacity**, SGT. COLBY NEIDIG** individually and in his official capacity and **SGT. CAROL EHLINGER** individually and in her official capacity and **JOSHUA PARKINSON**, individually and in his official capacity and **ROMI CHAOUK**, individually and in his official capacity.

91. Plaintiff incorporates the allegations contained in the previous paragraphs of this Amended Complaint as if fully set forth herein.

92. This count is brought for the benefit of Mr. Rogers' daughter, Lanesha Kennedy.

93. The defendants, acting within the scope of their employment, negligently and recklessly caused the death of Mr. Rogers, as previously described in this lawsuit.

94. Defendant City of Pittsburgh is responsible for its employees' actions taken in the scope of their employment as employees, police officers, and medical personnel.

95. As a direct and proximate result of said violation, Mr. Rogers and his Estate incurred pain and suffering, medical expenses, funeral expenses, and expenses related to the administration of the Estate, for which recovery is due to Lanesha Kennedy. Additionally, Lanesha Kennedy is entitled to compensation for the loss of her father, and the antecedent benefits to him being alive to include, *inter alia*, love, guidance, and care.

## COUNT SEVEN

### BATTERY UNDER PENNSYLVANIA COMMON LAW AGAINST CITY OF PITTSBURGH AND OFFICER KEITH EDMONDS
individually and in his official capacity

96. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

97. Officer Edmonds, acting within the scope of his employment, knowingly and intentionally battered Mr. Rogers as described above.

98. Officer Edmonds' actions were not justified or warranted under the circumstances and constituted the unreasonable and unnecessary use of force.

99. Officer Edmonds' actions directly and proximately caused Mr. Rogers to be injured and suffer damages.

100. Defendant, City of Pittsburgh, as the employer of Officer Edmonds, is responsible for his wrongdoing under the doctrine of respondent superior.

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

(A) An order declaring that Defendants' conduct violated Mr. Roger's rights as guaranteed by the First, Fourth and Fourteenth Amendments to the United States Constitution;
(B) An order granting compensatory damages, jointly and severally where appropriate, in an amount to be determined at trial;
(C) An order awarding punitive damages against the individual defendants in an amount to be determined at trial; and
(D) An order awarding Plaintiff reasonable attorneys' fees and costs under 42 U.S.C. § 1988, as well as any other relief that this Court finds appropriate and based on the evidence at trial.

**JURY TRIAL DEMANDED**.

                                     TODD J. HOLLIS LAW

                                By: /s/ Todd J. Hollis
                                Todd J. Hollis, Esquire
                                Supreme Court I.D. No. 72510

                                202 Penn Plaza
                                Turtle Creek, Pennsylvania
                                412.515.4483 Phone
                                412.646.5748 Facsimile
                                toddjhollis@gmail.com
                                Counsel for the Plaintiff:
                                Individually and as administrator of the
                                ESTATE OF JIM ROGERS, Decedent, and
                                on behalf of the Estate's Sole Beneficiary,
                                Lanesha Kennedy.

Date:  February 24, 2023